May it please the Court, Alina Schell with the Federal Public Defenders on behalf of Appellant Kevin Schultz. Mr. Schultz asked this Court to adopt a very simple rule. In order for a traffic stop to be reasonable, an officer must stop the driver as soon as it's safe and practical after witnessing the infraction. That simply is not what happened in this case, Your Honors. Is that a rule that we've already set? Your Honor, that is not a rule I could find during my research. This is your rule that you want us to adopt. To adopt, Your Honor, yes. Are you going to address the credibility or not the credibility, but the probable cause question at some point? Your Honor, I believe that the probable cause question and the credibility question are in some ways intertwined. I understand that, but I – well, go ahead. I don't want to direct your argument, but I'm interested in the question of whether there was, in fact, clear error with regard to the determination of what happened here. Your Honor, I believe there was clear error in this case, although I acknowledge that it is a very difficult, barter surmount challenging a credibility determination. I think here that the Court clearly erred because the testimony of their primary witness, Detective Giannone, was so littered with these sort of internal inconsistencies that if you took each one, they would be minor, but in the aggregate, it added up to a person who is fundamentally dishonest. So dishonest, indeed, when this case actually proceeded to trial, although he was the primary investigating officer in the case, he did not actually testify at trial. We can't draw any inference from that. That's a call that's made by a trial lawyer. Yes, Your Honor. But the district court judge found that what he was – the determination he was making for his report was for two different things, and he merely added things the second time which had to do with the report. That is, they don't – the police officers, you know, they're on the spot. They make these reports, and then they have other reports to make so you can find some inconsistencies. But the district court found reasons for all of those. Your responsibility, as I understand it, is to show those reasons are clearly erroneous. That is, the district court just simply couldn't have made those to be right. Yes, Your Honor. How are you going to do that on this record? I believe we can, Your Honor. When you look at – although I acknowledge that that's what the district court found, again, I believe the district court erred in that respect because – Clearly erred? Clearly erred, Your Honor, because the original arrest report omitted an entire body of facts about what was actually happening leading up to the investigation. If you read the report, you would think that at 10 o'clock, Detective Giannone and Detective Denton saw Kevin Schultz run through a stop sign. But what it omits is all the stuff that happened up to that. It omitted the alleged tip about a gun. It omitted the fact that they had actually been surveilling him for at least an hour prior to that. It also omitted – and what I think is really the most egregious issue here is it also omitted that they saw him run a stop sign, allegedly. And again, the testimony on that is so murky that you can't really tell if that happened. They saw him run a stop sign. They had an opportunity to stop him legally, but they didn't do that. What they did was they waited. He went. He parked at a drugstore. He went inside. They had an opportunity to stop him then, but they didn't think they had probable cause to get into the car, so they manufactured a situation. That is the point they made. What they said was it would be very, very harmful, perhaps harmful to many witnesses, in other words, to try and make a stop of a person they thought had a gun in a store. They wanted to wait until he was out on the street where it might be safer. Now, that's what they said. Your Honor, that is what they said, but I believe that's a bit of a red herring because it's not – I recognize it would not be safe to chase a suspect into a store and get – stop him there. They had ample opportunity when he was in the car, when he was walking to the car, when it was there at the parking lot, they could have very easily boxed him in and got him. They had two patrol cars very close by. My concerns are more around the question of the testimony about who saw him first and where the second time around, because that seems to be substantively critical. It's not just a question of whether the – whether Jean – how do you say his name? Jean? Did you know he was credible in some abstract fashion, but whether he was actually at that corner to see him go through the stop sign when he said he did. And I made a little chart of all the stories that were told about that. And ultimately – and it seems to me that in order to find clear error, we would have to say that the district court did not deal with something that's in the record. And with regard to that question, it seems to me that that at least is possible. The – because Giannone said at least four different things about it. Quintana said yet another thing. And I can't figure out quite how Giannone could have been where he said he was and seen what he said he saw on his last story. Yes, Your Honor. The testimony regarding who saw Mr. Schultz first is incredibly murky. At the – at the first evidentiary hearing on both direct and then on cross, Detective Giannone says that his supervising sergeant who was there actually saw Schultz first. He had gone – Schultz had apparently gone to his mother-in-law's house or like his girlfriend's mother's house, and then did see we saw him and radioed to Schultz. First he – to see we put it out on – on the dispatch. But then we take a break during the proceedings and – And then he says the same thing on cross after – He says the same thing on cross. There's a 10-minute break after the cross examination. And this is – this happens at about page 130 in the record and goes down to about 134. He – we take a break. He comes back and there's redirect testimony. And he changes his story completely. And he says, I no longer stand by that testimony. And when asked on recross about what happened, he said, the prosecutor refreshed my memory about what happened. And that, I think, Your Honor, is very damning testimony for Mr. Giannone. And now he's saying that in fact, see, we did see him first. He's – no, well, what he says when he comes back is, well – And again, it's very unclear. And there were two hearings in this case. And you read two sets of testimony about this. And you just don't come away with a picture of who actually saw him. And thus, Your Honor – But the third time at the hearing, and the second time, he says, the final story is, see, we saw him going down for – he radioed me. I just happened to be at that corner at that time, at that exact moment. Because we're talking about a one-minute time period. It's an incredible coincidence. And I saw him go through the stop sign. And then, see, we went and radioed the radio's dispatch at that point. So it has him just coincidentally being at that corner at the moment. Well, yes. And if I – you know, and again, Your Honor, the record does get confusing. When you look at it, it later seems like he says in a separate set of testimony at the district court evidentiary hearing that he actually saw – That was the district court evidentiary hearing. Or the – The last version. The last version. Thank you, Your Honor. Even for me, even though I went through all these hearings, it's still confusing me. You never really know who actually sees him first. And even, I believe, the magistrate court during the testimony says, well, this is a very – we're talking about a very – like, one minute where you just happen to be at the right place at the right time. So I don't know. If there are no other questions, I'm going to reserve the remainder of my time for rebuttal. You may. Thank you. Good morning. May it please the Court. Adam Flake for the United States. This Court has – the Supreme Court and this Court have both very clearly held repeatedly that when there are two permissible views of the evidence, the factfinder's choice between them cannot be clear error. So the question this Court needs to resolve is whether the district court's view of the evidence in this case was permissible. And as we laid out in our brief, the district court heard testimony that Schultz both did and did not run the stop sign. They heard testimony from a police officer that he ran the stop sign. They heard testimony from Schultz's passenger that he did not run it. And the Court chose to credit the officer's testimony. And this Court reviewing for clear error has no basis for overturning that determination. Well, why isn't it a basis that the explanations that a court gave for believing him are themselves erroneous? For example, the district court says that with regard to the Sealy question, which as I say, it's not – to me the important question isn't whether he was – he said different things and therefore he's not believable in general. It's more that the particular story really matters and there are reasons why he would be telling different stories. Because if he wasn't at that court and when he says he was, he couldn't have seen him run a stop sign. And so the district court, for example, says the way he accounts for this, all this changing around, is that during cross-examination before the magistrate judge who was responding to questions relating to the Cass report and could have understandably been confused, that's just not so. But first of all, Giannone said it himself to begin with, not on cross-examination. He said the same thing on cross-examination. But what he said on cross-examination was the same thing he'd already said on direct examination. So that explanation makes no sense. Well, what Sealy said, the very first – That's Sealy, Giannone said. Thank you. And moreover, what he said at – on – after the break during the magistrate judge's hearing was different from what he said at the district court hearing, and it was also different from what he had written down in his report. So the stories are all different, all over the place. Your Honor – And it's also – nobody mentions what Quintana said, which is – which essentially is that Sealy did not see these – find them again – find Schultz again until they were all in the parking lot. Twice. Quintana said that twice. The very first thing, the first thing that Detective Giannone said – and this is at ER 69 through 70, before the hearing of the magistrate – on direct examination before the magistrate judge, Giannone stated, Schultz was rediscovered, I believe, by Sealy. I was on Las Vegas Boulevard at the time, and Sergeant Sealy related to me that Schultz was traveling westbound on Ford Road. That's the very first thing that he said. Now, when he was approached with the CAD report, and the CAD report said – I picked him up – Sealy radios in that he picked him up headed northbound on Las Vegas Boulevard after making a right turn on Ford. Then the government readily concedes that he did give inconsistent testimony. He did – he got confused. He said, well, maybe I saw him first. I did see him run the stop sign. Maybe I saw him first. Maybe I was confused. I was mixed up. But when he testified before the district court, he actually explained this once again and said, Sealy sees him headed westbound from Ford to Las Vegas, tells me, I happen to be there. I pick him up, blowing the stop sign. I see him blow the stop sign. He turns right on Las Vegas. Sealy sees him headed northbound on Las Vegas and radios in that they have him. And then Sealy says, well, maybe I saw him first.  I'm not sure why he's believing him. And then Schultz pulls into the CDS. I mean, that obviously is an attempt to coordinate all the stories, but it has him coincidentally at this corner in this, you know, exactly at the moment that Sealy happens to have said this. But more than that, that really isn't my point. My question is on the clear error question. The district court's understanding of this or explanation of why he's believing him doesn't seem to me to hold up. Two things, Your Honor. First of all, as to it being a coincidence, I – if the court chooses to describe it that way, the court can call it a coincidence. But the district court is sitting as a fact finder and the district court is looking at these witnesses and deciding – And doesn't notice that at all, doesn't deal with that in any fashion. But the district court hears testimony that Mr. Schultz blew a stop – I witnessed Mr. Schultz blow a stop sign between 4 Road and Las Vegas Boulevard. And the court is sitting there and determining whether or not that testimony is credible or whether the – Counsel, does our case law require the district court to explain its credibility determination at all? What position would we be in if the court had simply said, I don't believe the passenger who's a convicted forger and I think is a general liar and I do believe the other witnesses, end of opinion. What would we do with that? Would we ourselves look at the record and determine if it can be reconciled with that or – Yes, Your Honor. So what do we make of an explanation that doesn't hold together? If, in fact, we think the court's explanation doesn't hold together? I – first of all, I do believe that it holds together. But I don't believe that the district court has an obligation to recreate and make a finding of fact as to every single minute of the traffic stop and determine whether every – like lay out exactly how every single minute of this traffic stop occurred. The district court made findings that key testimony was credible. He blew the stop sign. He waved Miranda, things like that. And those credibility determinations are what the court is reviewing, and the court looks to see if those determinations are clearly erroneous. And on this record, I don't believe it can reach that conclusion. If the panel has any further questions, I'm happy to address them. Otherwise, I'll see you the rest of my time. There is a legal question in this case, which this is not, particularly, which is the propriety of the delayed stop. I'm happy to address that, Your Honor. The court is well aware, it says it in every Fourth Amendment case, the touchstone of the Fourth Amendment is reasonableness. The court looks at the ways, the intrusion against the government's interest. Here, the intrusion itself was the traffic stop, which was supported by probable cause. We know that that's okay under the Wren case, which we cited. And so the entire question is whether this brief delay, this approximately 14-minute delay, whether that was really an intrusion at all, and if it was, whether the intrusion was warranted because of the government's interest in this case. To the extent that it was an intrusion at all for them to, for the police officers to sit across a huge parking lot and wait for Mr. Schultz to return to his vehicle, if that was an intrusion of any sort, it was very minimal, and the officer's interest, the public interest here, is extremely weighty. The officers testified, we weren't going to go chasing this man into, we thought he might have a gun. We're not going to go chasing him into a CVS and accost him. We're going to wait until the situation presents itself to where we are in a safe situation, where we are in control of the situation. I would point the Court to the Williams opinion, which we cited in our brief, which really lays out the fact that it's not really, the question isn't really whether you can order somebody into their car or order them out of their car, and exactly the Court determining what is the safest way to do the stop in every situation. The Williams case is quite clear that the Court gives great weight to officers' belief that they need to handle the stop in a way that ensures their safety. But just hypothetically, I mean, you seem to be agreeing that there at least has to be a reason. I mean, suppose they had just decided to follow the guy around for two hours and then stop him. I mean, just in terms of what the law is, I understand that's not what happened here. But, I mean, what is your position about what the legal rule is? I mean, it's difficult to draw, to try to figure out what a legal rule is based on a hypothetical that's not really before us. I think, I mean, there probably is a – That's why a hypothetical is hypothetical. Right. I mean, maybe there is a point where, you know, if the police – if they saw him blow a stop sign and he drove around for two hours and they followed him, you know, even though they didn't stop him, they followed him closely behind for two hours or two days, maybe at some point it would become too intrusive. They could follow him without having any reason – without having the probable cause to stop him. So that can't be the problem. I'm just trying to understand whether your argument is that you can stop somebody at any point for a traffic violation that happened earlier. And I'm not sure why you couldn't, but certainly they don't. And I think it has more to do with warrant requirements, that you're allowed to stop people in automobiles for things that have to do with the automobile, you know, without a warrant, but after some point you'd think that would dissipate. It's really not so much the reasonableness of the delay. It's why at some point why aren't you getting a warrant. I agree, Your Honor. And I frankly don't – I do not know what the point would be. It's certainly not present here when it was 14 minutes, 11 of which he'd spent in the CVS, in which the officers clearly testified that they weren't comfortable doing the stop in that situation. Thank you, counsel. I see that I'm out of time. Thank you. Thank you, Your Honor. Ms. Schall, you have a little rebuttal time remaining. Thank you, Your Honor. Since I deflected you, would you tell us what you do think the rule is on the delay question? On the delay question, Your Honor, I believe the rule is it has to be as soon as it's safe and practical to stop. There's a, you know, here in this case, what I find particularly interesting is if you look at page 175 of the record, Officer Grantham, who is one of the officers who ended up stopping Mr. Schultz and helping conduct the inventory search where they did not find the gun at first, said – testified that Giannone said, as soon as the vehicle is moving again, we'll find it and then we can pull it over. They knew it was there. They had an opportunity to stop it. They did not stop it. There's a lot of testimony about – I mean, there's – Where does that rule come from in a Fourth Amendment? In a sense. I mean, what is the – why is the intrusion different if you stop them two hours later? I mean, here I think it's highly debatable whether it was reasonable. But let's suppose it wasn't debatable in the sense there was no reason for the delay at all. But suppose it was two hours later and they just wanted to go have lunch. And then they went and they stopped the guy. How is the intrusion different? That's what I'm having a hard time with. And is – or is the real underlying problem here at some point you have to get a warrant? I – well, at some point they did have to get a warrant. And they attempted to sidestep that requirement by delaying the stop. And I don't think there really is a bright-line rule. I think in each case you're going to have to look at the facts and see what the – what the line should be. But where is it coming from? I mean, what's the source of this problem? The source of the rule, Your Honor, is if, as government counsel said first, is the requirement in the Fourth Amendment that a seizure be reasonable. And here it's not reasonable to stop someone, considering the very minor nature of the alleged infraction here, which was a traffic infraction. It doesn't make sense that you would delay stopping someone. Because it's hanging over your head in the meanwhile, so it makes your life unhappy. I mean, why is the intrusion different? That's what I'm trying to understand. The intrusion is different, Your Honor, because I, as a hypothetical, I'm going over time, if that's okay, Your Honor. You may answer this question. Okay. If the – if, let's say, for example, I go home, I get out of the airport, I blow through a stop sign going through the – leaving the airport, is it reasonable for an officer to stop me two hours later? My expectation is I'm going to be able to drive around or I'm going to be able to go home and live my life and be free and not have this cloud hanging over me that maybe the police are going to come and get me one day for something I did two hours ago, a week ago, a month ago. Thank you, Your Honor. Thank you, counsel. The case just argued is submitted. We appreciate the helpful comments from both of you.
judges: Wallace, Graber, Berzon